FILED
OCT 23 2024
U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,        ) | |
| )   | |
| Plaintiff,                    )   | |
| )   No. S1-4:23-cr-00293 HEA JSD | |
| v.                                 ) | |
| )   | |
| BRANDON BOSLEY,                    ) | |
| )   | |
| Defendant.                    )   | |

## SUPERSEDING INDICTMENT

**THE GRAND JURY CHARGES:**

### COUNTS 1 - 4
### WIRE FRAUD

A. INTRODUCTION

At all times relevant to the Superseding Indictment:

1. The defendant, **BRANDON BOSLEY** (hereinafter referred to as "**BOSLEY**"), was a resident of the City of St. Louis, Missouri, and served as the Alderman for the 3rd Ward.

2. An individual whose identity is known to the Grand Jury (hereinafter referred to as "John Doe"), owned and operated a used car sales business located in Jennings, Missouri, and a car repair garage located in Bridgeton, Missouri. Further, John Doe owned and operated a convenience store in **BOSLEY's** 3rd Ward of the City of St. Louis.

3. On or about March 30, 2021, **BOSLEY** purchased a 2010 Toyota Prius automobile from John Doe's used car business. The Certificate of Title listed $3,000 as the purchase price, although **BOSLEY** only paid John Doe $500 cash. At that time, the retail sales value of the automobile was approximately $9,980.00, per Carfax. John Doe had purchased the Prius at auction and repaired the vehicle for a total cost to him of $4,900.00. **BOSLEY** took possession

1

of the Prius automobile and drove it as his personal automobile. However, he did not formally register or title the Prius in his name with the State of Missouri Department of Revenue as required by State of Missouri law until on or about April 5, 2022.

4. On or about September 16, 2021, as the Prius automobile was parked in front of **BOSLEY's** St. Louis office, another automobile struck the parked Prius causing damage to it. While the driver of the other automobile had collision and liability automobile insurance through the Missouri Farm Bureau Insurance Company, **BOSLEY** was not contacted by the insurer until on or about February 9, 2022, some five months after the accident.

5. On or about February 9, 2022, a representative of Missouri Farm Bureau Insurance Company contacted **BOSLEY** and advised him that they insured the driver who struck the Prius automobile, and that Missouri Farm Bureau Insurance would pay for any necessary repairs to the Prius automobile.

B. SCHEME TO DEFRAUD

6. Beginning on or about February 9, 2022, and continuing through on or about April 12, 2022, in the Eastern District of Missouri and elsewhere, defendant,

**BRANDON BOSLEY,**

acting with one and more other individuals known and unknown to the Grand Jury, devised, intended to devise, and knowingly participated in a scheme to defraud and obtain money from Missouri Farm Bureau Insurance Company, by means of materially false and fraudulent pretenses, representations, and promises.

7. It was a part of the scheme that, on or about February 10, 2022, **BOSLEY** spoke with John Doe on a telephone call about having John Doe prepare an estimate to repair the damage to the Prius automobile for the insurance company. During the conversation, **BOSLEY**

suggested to John Doe that he didn't necessarily want the Prius repaired, but wanted it considered a total loss in the repair estimate to the insurance company.

> **BOSLEY**: "Well, real talk, I may not even want it fixed. I may just want it where I have something different. I honestly think it's totaled, and, uh, you know, it drives sideways."

8. As a further part of the scheme, on February 10, 2022, following their original telephone call, **BOSLEY** drove the Prius automobile to John Doe's business and met with John Doe to discuss the damaged automobile. John Doe and one of his repair shop employees inspected the Prius automobile's damage. During their conversation, **BOSLEY** offered a bribe to John Doe to have a falsely inflated repair estimate prepared in order to provide it to Missouri Farm Bureau Insurance in the hope that the insurer would determine that the automobile was totaled, and pay **BOSLEY** accordingly.

> **BOSLEY**: "I don't know 100% what the damages are, but of course you've seen the car, you know how it's driving. If it's fixable and it's reasonable then I'm definitely with trying to figure out how to fix it. But if it's not, fuck that car, man. You know, mark that motherfucker all the way up, see what it is we can do, I'll throw you a few thousand dollars, and fuck that insurance company."
>
> . . . . .
>
> **BOSLEY**: "So, what I don't want is, I don't want them to low ball us. I know how insurance companies do shit, you know. Of course, you know their whole business is based on trying to maintain as many dollars as they can. Fuck that insurance company. I don't give two shits about 'em….I'm not bothered by hitting them with as much as we can….I told them I'm an elected official…."
>
> . . . . .
>
> John Doe: "So, I seen [the Prius], and I checked it with my friend over there, he's good at body work. You know I have a body shop at a different address in the county. So, if I want to fix it, will be about $2,000, $2,200, you know? But, now, I can make an estimate you know, so, I can make an estimate for, you know, whatever."
>
> **BOSLEY**: "Bro, I'm gonna say, max that shit out."
>
> John Doe: "OK."
>
> **BOSLEY**: "Like, period. I know what these insurance companies do."

3

. . . . .

**BOSLEY:** "So, just so you know, I'd rather you just total the whole thing out."

. . . . .

John Doe: "So, the vehicle's worth about $11,440, as you see right here on the Carfax....So now I can do whatever you want me to do. To total this out I have to make an estimate that is going to be about seven grand ($7,000). You know what I mean? Because insurance must pay if the damage is more than 51% of the vehicle, you know what I mean? So, I can have my guy go ahead and do the estimate for over 51% of what the vehicle is worth. To get it totaled, you know what I mean, then that's where they're going to be paying you off."

. . . . .

John Doe: "It's your call. Tell me what you want, I do this."

. . . . .

John Doe: "So, whatever you want to make the estimate look, I'll make it look."

**BOSLEY**: "Understand....I would say, if you can, total it out."

John Doe: "I'll do it."

. . . . .

**BOSLEY:** "These companies is made for capitalism, when I say I despise them, I don't give two fucks about no insurance company. I despise them. Because I know what they do. Like, I deal with them. I help them, unfortunately, even with the laws I make, help them create the scenarios that they create. I'm involved in this shit....So, I'd be a motherfucking fool to be sitting here like these people don't owe us something....Let's see what we can get from these guys. Break some shit up, and keep pushing."

. . . . .

John Doe: "OK, so we're set?"

**BOSLEY:** "I think we're set. So we just knock it out, if we can total it, let's total it...."

John Doe: "So, 51%, let me see, what it will be, I think, they want over 51% to be totaled, if you want it to be totaled."

**BOSLEY**: "So it would be almost $6,000 then....5,570."

John Doe: "5,570. Alright, that's what I'll give the guy who does the estimate, to be around that number to be able to total it out."

**BOSLEY**: "OK."

4

John Doe:   "Fair enough?"

**BOSLEY**:   "Yep, I think that's fair enough, and we'll figure out what happens from there.   If they say some shit, we just counter it and we'll figure it out."

9.   As a further part of the scheme, on February 14, 2022, **BOSLEY** met with John Doe, and the two reviewed the falsely inflated repair estimate that John Doe had prepared at **BOSLEY's** direction.

John Doe:   "I'm going to do exactly what you want me to do, so, I'm going to just add up all the good stuff in there and just total it, you know?"   (referring to the falsely inflated repair estimate)

**BOSLEY**:   "I appreciate it."

. . . . .

John Doe:   "You know, all the good stuff that…couple of grand, $2,200 is the normal. But what I did, you know jumped it way up to total it you know, like…here you go, here's the estimate, 6,868.08."

**BOSLEY**:   "OK."

John Doe:   "OK.   But, this one, instead of, my guy just put 2 hours in there, here it is right here.   Look, I'm going to extend it 5 hours…it'll bump it up just a little bit more, but it'll show instead of 2 hours…you know 5 hours…you know what I mean?"

**BOSLEY**:   "Understood."

John Doe:   "See the little trick in there?"

**BOSLEY**:   "Right, makes a, makes a difference."

. . . . .

**BOSLEY** told John Doe that he might want to buy the car back from the insurance company if they totaled it and paid out on it.   **BOSLEY** asked John Doe to prepare a second, actual repair estimate if he did buy it back.

**BOSLEY**:   "So, they may offer to, they may offer to, I guess, uhm, sometimes they offer like the body part back to keep it, you know?   I don't know how they're gonna do it.   But if they do, I want you to give me another estimate at some point in time."

John Doe:   "Anything you need."

5

. . . . .

**BOSLEY**: "I'm all the way good with that."  (referring to the falsely inflated repair estimate)

John Doe: "See, look at that, I bump it as much as I could, my man."

**BOSLEY**: "I appreciate it."

John Doe: "Just like you wanted."

**BOSLEY**: "I certainly appreciate it…."

John Doe: "When I say about this, it's thanks from me to you, you understand?  But you don't need to give me anything on this one, OK?  This is all yours, alright?"

**BOSLEY**: "I appreciate it."

John Doe: "Yep."

**BOSLEY**: "Good looking out, man."

10.     As a further part of the scheme, on or about February 15, 2022, John Doe sent **BOSLEY** the falsely inflated repair estimate via an email in support of **BOSLEY's** insurance claim on the Prius automobile.  Further, on or about February 23, 2022, the falsely inflated repair estimate was sent to Missouri Farm Bureau Insurance.  **BOSLEY** requested John Doe's continued assistance in dealing with his false insurance claim.

**BOSLEY**: "So I guess what I'll do as far as moving forward, I'll call them tomorrow and get a contact number and then I'll have them call you."

John Doe: "Just let me know, whatever you need, my man."

**BOSLEY**: "Appreciate it."

11.     On February 24, 2022, a Missouri Farm Bureau Insurance Company Adjuster telephoned John Doe to discuss the Prius automobile repair estimate.  The Adjuster complained that the hourly labor rates for certain of the included repairs were too high, including for frame

work, body work, and painting. John Doe agreed to adjust the repair estimate and send the adjusted estimate to the Adjuster. Following his telephone call with the insurance company Adjuster, on February 24, 2022 John Doe telephoned **BRANDON BOSLEY** to tell him what the Adjuster had said, and to get **BOSLEY's** direction on what to do next. As a further part of the scheme, **BOSLEY** directed John Doe to make adjustments to the inflated repair estimate that the Adjuster had requested.

> John Doe: "Hey, this guy did call me. Is his name Paul?"
>
> **BOSLEY**: "Yep, that's his name."
>
> John Doe: OK, I just want to make sure we're both on the same page you know? What he was talking about."
>
> **BOSLEY**: "Say it again?"
>
> John Doe: "What he was talking about. So we can both be on the same page, you know?"
>
> **BOSLEY**: "So, he was saying that the labor was like double the average…I told him just, well call you and figure out how to work it out. But he wanted to take the car to another shop. And I was, you know, basically, like, 'I don't want it to go anywhere else, just call him and work it out. Readjust it, whatever you've got to do, just figure it out.'"
>
> John Doe: "OK. So, he was complaining about the labor hours?"
>
> **BOSLEY**: "Exactly. Yup, exactly what he talked about, the labor hours."
>
> John Doe: "Yeah. He did mention that. So, OK, he wanted me to refigure something about the labor, OK? So, I'm going to do that...."
>
> **BOSLEY**: "OK, cool. Just send him what you got, and do what you can [U/I]. I'll just roll with the outcome."
>
> . . . . .
>
> John Doe: "Let me work on the estimate, try to get close to his hours and go from there."
>
> **BOSLEY**: "OK, that'll work. Well, I appreciate you."

12.   As a further part of the scheme, on February 28, 2022, John Doe and **BOSLEY**

7

discussed the Prius repair estimate during a telephone conversation. **BOSLEY** directed John Doe to submit a revised repair estimate which John Doe had prepared in the total amount of $4,333.08 to the Missouri Farm Bureau Insurance Company Adjuster, knowing that the revised repair estimate was falsely inflated.

> John Doe: "Brandon, I just sent you another estimate…To be honest, I did like you told me to when I met you, I kind of like went up on the estimate as much as I could. This one is a lot, but a little less than the first one, you know?...So, it's not as good as the other one, but it's still, you know, more than what we need to fix it for. To fix it, it's kind of like way cheaper than what it is, you know what I mean?"
>
> **BOSLEY**: "Right. Got you."
>
> John Doe: "So, now I just want your OK to go ahead and proceed and send him this estimate so he can get it because he is waiting on it."
>
> . . . . .
>
> John Doe: "So, if you look in the bottom…." (referring to the falsely inflated repair estimate)
>
> **BOSLEY**: "OK, I mean, yeah, that'll work."
>
> John Doe: "That'll work?"
>
> **BOSLEY**: "Yeah, that'll work."
>
> John Doe: "Yeah, like I said, you know, the damages on it, is not really that much damage. So, I tried my best, but it kind of made his attention to a few things so I reduced it and I want you, before I send it back to him, I want to share it with you and if you're OK with that, I'll go ahead and send it over to him."
>
> **BOSLEY**: "Yeah, I appreciate it. Yeah, I'm good with this."
>
> John Doe: "No problem. OK, my brother."
>
> **BOSLEY**: "That will work, well I appreciate it."
>
> John Doe: "Yep."
>
> **BOSLEY**: "OK, just let me know how it goes."

As **BOSLEY** directed, John Doe sent the revised falsely inflated repair estimate in the amount of

$4,333.08 by email to Missouri Farm Bureau Insurance Company.

13. As a further part of the scheme, on March 1, John Doe and **BOSLEY** discussed the Prius insurance claim during a telephone conversation. **BOSLEY** advised John Doe that a Missouri Farm Bureau Insurance Company representative had contacted him, and advised him that, based upon the repair estimate, the insurance company considered the Prius automobile totaled.

**BOSLEY**: "He said it's totaled, so I guess good job on that one."

**BOSLEY** then met with John Doe at John Doe's business in order to clean out the Prius of any of **BOSLEY's** personal belongings. While there, **BOSLEY** told John Doe that the insurance company was going to pay him approximately $6,000 because the Prius had a "salvage" title, and that the insurance company would have the Prius towed from John Doe's repair shop.

**BOSLEY**: "How you doing today, you been OK?"

John Doe: "We win."

**BOSLEY**: "Yeah, look like we got it man, appreciate you, bro."

John Doe: "You had some great ideas, it worked out."

**BOSLEY**: "Yeah, I appreciate that, yeah, you got it together."

John Doe: "What he was talking about?"

**BOSLEY**: "Oh, nothing. He was just saying, he said that it was a salvage title and you know it's worth about $6,000. And he said from the damage it's totaled, and just take all, get your items and get the title and bring it to me and sign off on it, and we'll come get the car."

Missouri Farm Bureau Insurance Company then had the Prius towed to an automobile auction company for later sale.

14. On March 9, 2022, **BOSLEY** advised John Doe that he had not yet received the insurance check for the Prius damage, because he never officially registered the car in his name.

9

John Doe: "Hey brother have you got you check from the insurance yet?"

**BOSLEY**: "No not yet I need to register the car first...."

15.     On April 1, 2022, **BOSLEY** advised John Doe that he was going to register the Prius that afternoon in order to collect the insurance check.

John Doe: "How's everything with you? Did you finish the situation with the insurance?"

**BOSLEY**: "An, no, not yet, I still haven't went took that title up there. I'm doing that today so I can get everything transferred."

. . . . .

**BOSLEY**: "I just haven't done it just yet."

16.     On April 1, 2022, **BRANDON BOSLEY** took steps to formally register the Prius automobile with the Missouri Department of Revenue using the false bill of sale. The Missouri Department of Revenue then issued **BOSLEY** a salvage title for the Prius in his name. **BOSLEY** then provided the title to a Missouri Farm Bureau Insurance Company representative, and negotiated a higher payout on his accident claim than he was previously offered.

17.     On April 11, 2022, Missouri Farm Bureau Insurance Company issued **BRANDON BOSLEY** a Property Damage Release Form in order to release the settlement funds totaling $7,978.90 to Bosley. This Property Damage Release Form was sent by email communication via the internet. **BOSLEY** subsequently obtained the funds via wire transfer from Missouri Farm Bureau Insurance Company on April 12, 2022 and, in a follow up conversation with John Doe, requested and authorized John Doe to offer up to $2,000 to the automobile auction company where the Prius automobile was being held in order to buy the Prius automobile back, and have John Doe make the necessary repairs for **BOSLEY**.

18.  As previously discussed between **BOSLEY** and John Doe relative to John Doe's convenience store in **BOSLEY's** 3rd Ward, on February 11, 2022, **BOSLEY's** Board Bill lifting the liquor license moratorium in the 3rd Ward was passed out of the Board of Aldermen and ultimately became an Ordinance on March 3, 2022.

C. <u>THE WIRES</u>

**<u>COUNT ONE</u>**

19.  On or about February 15, 2022, within the Eastern District of Missouri and elsewhere, for the purpose of executing and attempting to execute the above-described scheme to defraud and to obtain money and property by means of false and fraudulent pretenses and representations, the defendant did knowingly cause to be transmitted by means of wire communication in and affecting interstate commerce, certain writings, signs, and signals, including a falsely inflated repair estimate for the Prius automobile in the amount of $6,868.08 sent by email via the internet from John Doe to defendant, which email was processed through servers located outside Missouri.

**<u>COUNT TWO</u>**

20.  On or about February 28, 2022, within the Eastern District of Missouri and elsewhere, for the purpose of executing and attempting to execute the above-described scheme to defraud and to obtain money and property by means of false and fraudulent pretenses and representations, the defendant did knowingly cause to be transmitted by means of wire communication in and affecting interstate commerce, certain writings, signs, and signals, including a falsely inflated repair estimate for the Prius automobile in the amount of $4,333.08 sent by email via the internet from John Doe to Missouri Farm Bureau Insurance Company, which email was processed through servers located outside Missouri.

**COUNT THREE**

21. On or about April 11, 2022, within the Eastern District of Missouri and elsewhere, for the purpose of executing and attempting to execute the above-described scheme to defraud and to obtain money and property by means of false and fraudulent pretenses and representations, the defendant did knowingly cause to be transmitted by means of wire communication in and affecting interstate commerce, certain writings, signs, and signals, including a Property Damage Release Form in the amount of $7,978.90, which Property Damage Release Form was sent by email via the internet from Missouri Farm Bureau Insurance Company to defendant, which email was processed through servers located outside Missouri.

**COUNT FOUR**

22. On or about April 12, 2022, within the Eastern District of Missouri and elsewhere, for the purpose of executing and attempting to execute the above-described scheme to defraud and to obtain money and property by means of false and fraudulent pretenses and representations, the defendant did knowingly cause to be transmitted by means of wire communication in and affecting interstate commerce, certain writings, signs, and signals, including a wire transfer in the amount of $7,978.90 from Missouri Farm Bureau Insurance Company's bank account at Commerce Bank to defendant's bank account at Neighbors Credit Union, which wire transfer was processed through servers located outside Missouri.

All in violation of Title 18, United States Code, Sections 2, 1343, and 1349.

**COUNT FIVE**
**FALSE STATEMENTS**

23. The allegations contained in the preceding paragraphs 1 through 18 of this Superseding Indictment are repeated, realleged, and incorporated as if fully set forth herein.

24. On or about March 10, 2023, within the Eastern District of Missouri, the defendant,

**BRANDON BOSLEY,**

did willfully and knowingly make one and more materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, by making false statements to Special Agents of the Federal Bureau of Investigation as to his actions and conduct relative to his scheme to defraud Missouri Farm Bureau Insurance Company, to wit:  Defendant falsely claimed to have paid $1,500 for the Toyota Prius automobile when, in fact, he had only paid $500 for the automobile; Defendant falsely denied having reviewed the Carfax statement for the Toyota Prius automobile when, in fact, he had reviewed it; Defendant falsely denied having seen and reviewed the two falsely inflated repair estimates sent to Missouri Farm Bureau Insurance Company when, in fact, he had seen and reviewed both false estimates before they were sent to Missouri Farm Bureau Insurance Company; Defendant falsely claimed that the repair estimates for the Toyota Prius automobile sent to Missouri Farm Bureau Insurance Company were not falsely inflated, and that Defendant had not asked that they be falsely inflated in order to total the automobile when, in fact, Defendant well knew the repair estimates were falsely inflated and well knew that he asked that they be falsely inflated in order for the insurance company to total the automobile.

All in violation of Title 18, United States Code, Section 1001.

A TRUE BILL.

_____
FOREPERSON

SAYLER A. FLEMING
United States Attorney

_____
HAL GOLDSMITH, #32984(MO)
Assistant United States Attorney